723 So.2d 148 (1998)
Pressley ALSTON, Appellant,
v.
STATE of Florida, Appellee.
No. 87275.
Supreme Court of Florida.
September 10, 1998.
Rehearing Denied December 17, 1998.
*150 Teresa J. Sopp, Jacksonville, for Appellant.
Robert A. Butterworth, Attorney General, and Barbara J. Yates, Assistant Attorney General, Tallahassee, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing a death sentence upon Pressley Alston. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. Appellant was convicted of first-degree murder, armed robbery, and armed kidnapping. For the armed robbery and armed kidnapping convictions, the trial court imposed consecutive life sentences. We affirm.
The victim in this case, James Lee Coon, was last seen January 22, 1995, while visiting his grandmother at the University Medical Center in Jacksonville. Coon's red Honda Civic was discovered the next day abandoned *151 behind a convenience store. A missing persons report was filed shortly thereafter.
At trial, Gwenetta Faye McIntyre testified that on January 19, 1995, appellant was living at her home when they had a disagreement and she left town. On January 23, 1995, the day after Coon's disappearance, McIntyre returned to Jacksonville. On that day, McIntyre and three of her children were in her gray Monte Carlo parked at a convenience store when appellant and Dee Ellison, appellant's half-brother, drove up in a red Honda Civic. They parked the Honda perpendicular to the Monte Carlo, blocking McIntyre's exit. Appellant got out of the Honda and approached McIntyre, who reacted by driving her car forward and backward into the store and into the Honda. Appellant took McIntyre's keys from the ignition. He then went back to the Honda and drove it around to the back of the convenience store, where he abandoned it.[1] Appellant and Ellison then got into the Monte Carlo, and everyone left the scene together. At that time, McIntyre asked appellant about the Honda. He replied that it was stolen. McIntyre also noticed that appellant was carrying her .32 caliber revolver, which she kept at her home.
Despite their previous differences and the incident at the convenience store, appellant continued to live with McIntyre. Soon thereafter, McIntyre began seeing news broadcasts and reading news reports about Coon's disappearance and the fact that Coon drove a red Honda Civic, which was found abandoned behind a convenience store. McIntyre became suspicious of appellant. When she confronted him with her suspicions, he suggested that someone was trying to set him up. McIntyre was also concerned because the news stories contained eyewitness accounts of the red Honda being rammed by a gray Monte Carlo in the parking lot of the same convenience store behind which the Honda was found. Appellant suggested painting the Monte Carlo a different color, which appellant did on or about February 19, 1995.
McIntyre testified that she became more suspicious when appellant asked her how long it would take for a body to decompose and how long it would take for a fingerprint to evaporate from a bullet. McIntyre confided her suspicions in her minister, who eventually put her in touch with the Jacksonville Sheriff's Office. On May 25, 1995, McIntyre went to the sheriff's office to talk with several detectives, including Detectives Baxter and Roberts. After the interview with McIntyre, police secured McIntyre's consent to search her home. Police retrieved, among other things, McIntyre's .32 caliber revolver from her home.
Based on the information that McIntyre gave to detectives and the evidence gathered from her home, police arrested Ellison and later on the same day arrested appellant. At the police station, appellant was read his rights, and he signed a constitutional rights waiver form. After detectives told appellant that they knew about the incident at the convenience store, that they had the murder weapon, and that they had Ellison in custody, appellant confessed, both orally and in writing, to his involvement in the crime.
In his written confession, appellant stated that during the week preceding Coon's disappearance, appellant had been depressed due to employment and relationship problems. He and Ellison planned to commit a robbery on Saturday, January 21, 1995, but they did not find anyone to rob. On Sunday, January 22, 1995, they saw Coon leave the hospital in his red Honda Civic. Appellant stated that he and Ellison made eye contact with Coon, and Coon "pulled up to them." Appellant and Ellison got into Coon's car. Ellison rode in the front seat and appellant in the back. After Coon drove a short distance, Ellison pointed a revolver at Coon and took Coon's watch.[2] Appellant told Coon to continue driving. They rode out to Heckscher Drive and stopped. Ellison then took Coon's wallet, and he and appellant split the cash found inside, which totaled between $80 and $100. As appellant searched Coon's car, some people *152 came up, so appellant, Dee, and Coon drove away.[3] They drove to another location, where appellant and Ellison shot Coon to death.
Following the confession, appellant agreed to show detectives the location of Coon's body. Appellant directed Detectives Baxter, Roberts, and Hinson, along with uniformed police, to a remote, densely wooded location on Cedar Point Road. Detective Baxter testified that a continuous drive from the University Medical Center to where Coon's body was found, a distance of approximately twenty miles, takes twenty-five to thirty minutes. During the ensuing search, Detective Hinson asked appellant what happened when appellant took Coon into the woods. Appellant replied, "We had robbed somebody and taken him in [the] woods and I shot him twice in the head." Because of the darkness and the thickness of the brush, police were unable to find Coon's body, and they terminated the search for the remainder of that evening.
On the way back to the police station, at appellant's request, he was taken to his mother's house. When Detective Baxter mentioned that appellant was arrested regarding the Coon investigation, appellant's mother asked appellant, "Did you kill him?" Appellant replied, "Yeah, momma." The detectives then took appellant back to the police station. By then, it was 3:30 on the morning of May 26, 1995. At that time, the detectives had to walk appellant to the jail, which is across the street from the police station. A police information officer alerted the media that a suspect in the Coon murder was about to be "walked over" to the jail. During the "walk-over," which was recorded on videotape by a television news reporter, appellant made several inculpatory remarks in response to questions from reporters.
Later during the morning of May 26, 1995, Detectives Baxter and Hinson, with uniformed officers, took appellant back to the wooded area and resumed their search for Coon's body. At this time, appellant was again advised of his constitutional rights. Appellant waived his rights and directed the detectives to the area that was searched the previous day. The body was discovered within approximately ten minutes of the group's return to the area.
The remains of Coon were skeletal. The skull was apparently moved from the rest of the skeleton by animals. Three bullets were recovered from the scene. One was found in the victim's skull. One was in the dirt where the skull would have been had it not been moved. Another was inside the victim's shirt near his pocket. Using dental records, a medical expert positively identified the remains as those of James Coon. The expert also testified that the cause of death was three gunshot wounds, two to the head and one to the torso. The expert stated that he deduced there was a wound to the torso from the bullet hole in the shirt. He explained that the absence of any flesh or soft tissue made it impossible to prove that the bullet found inside the shirt had penetrated the torso. The expert further testified that Coon was likely lying on the ground when shot in the head.[4]
A firearm expert testified that the bullets recovered at the scene were .32 caliber, which was the same caliber as the weapon retrieved from McIntyre's home. This expert further testified that, in his opinion, there was a ninety-nine percent probability that the bullet found in the victim's skull came from McIntyre's revolver. However, because the bullet found in the dirt and the bullet found inside Coon's shirt had been *153 exposed for such a long period, a positive link between those two bullets and McIntyre's revolver was impossible.
Later during the day that Coon's body was found, appellant contacted Detective Baxter from the jail and asked the detective to meet with him. Appellant did not make a written statement at this meeting. According to Detective Baxter's testimony, appellant stated that he did not kill Coon but that Ellison and someone named Kurt killed Coon. Appellant stated that he initially placed the blame on himself because he wanted to be "the good guy." Detective Baxter told appellant that he did not believe him and began to leave. Appellant asked Detective Baxter to stay and told him that he lied about Kurt because he heard that Ellison was placing the blame on him. Appellant then stated that he shot Coon twice in the head and that Ellison shot him once in the body.
On June 1, 1995, appellant requested that Detectives Baxter and Roberts come to the jail. The detectives took appellant to the homicide interrogation room. Appellant was advised of his rights. Appellant then signed a constitutional rights form and gave a second written statement. In this statement, appellant stated that Ellison and Kurt initially kidnapped Coon during a robbery. Ellison sought out appellant to ask him what to do with Coon, who had been placed in the trunk of his own car. Appellant stated that when he opened the trunk, Coon was crying and he begged, "Oh, Jesus, Oh Jesus, don't let anything happen, I want to finish college." Appellant said he told Ellison that "the boy will have to be dealt with, meaning kill[ed]," because he could identify them. Kurt left and never came back. Thereafter, appellant and Ellison drove to Cedar Point Road. Once all three were out of the car, appellant gave Ellison the gun and told him, "You know what's got to be done." Ellison took the weapon, walked Coon into the woods, and shot Coon once. Appellant stated that he then walked into the brush and, wanting to ensure death, shot Coon, who was lying face down on the ground. Appellant stated that Ellison also fired another round.
Police eventually located the person appellant had called Kurt. After interrogating Kurt, police concluded he was not involved in Coon's murder.
The jury convicted appellant of first-degree murder, armed robbery, and armed kidnapping. In the penalty phase, the jury recommended a death sentence by a vote of nine to three. The trial court found the following aggravators: (1) the defendant was convicted of three prior violent felonies;[5] (2) the murder was committed during a robbery/kidnapping and for pecuniary gain;[6] (3) the murder was committed for the purpose of avoiding a lawful arrest;[7] (4) the murder was especially heinous, atrocious, or cruel (HAC);[8] and (5) the murder was cold, calculated, and premeditated (CCP).[9] The trial court did not find any statutory mitigators. The trial court then considered the following nonstatutory mitigators: (1) appellant had a horribly deprived and violent childhood; (2) appellant cooperated with law enforcement; (3) appellant has low intelligence and mental age (little weight); (4) appellant has a bipolar disorder (little weight); and (5) appellant has the ability to get along with people and treat them with respect (no weight). The trial court imposed consecutive life sentences on the armed robbery and armed kidnapping counts and, after weighing the relevant factors, concurred with the jury's recommendation of death for the murder conviction. Appellant raises seventeen issues on appeal.[10]
*154 Appellant's first claim is that the trial court erred in not granting appellant's motion to suppress the statements appellant gave to Detectives Baxter, Roberts, and Hinson on May 25 and 26, 1995, on the basis that the statements were involuntary. Specifically, appellant argues that the cumulative effect of the following factors made his confession involuntary: (1) he was not informed of the nature of the charges against him contemporaneously with being taken into custody; (2) appellant did not properly understand his rights; (3) police induced appellant's statements using a "Christian burial speech"; and (4) police told appellant that if he cooperated they would speak with the judge and state attorney.
Initially, appellant argues that his statements were involuntary because he was not informed of the charges against him contemporaneously with being taken into custody. We do not agree. Based upon the circumstances of appellant's arrest, we find that it was reasonable for the officers who placed appellant under arrest to defer advising appellant of the charges against him because of the officers' concern for their own safety and because of the lack of information concerning the case.
At the suppression hearing, Detective Baxter testified that he asked two sergeants to arrest appellant because he, along with Detective Roberts, was interrogating Ellison. In this interrogation, Ellison told the detectives that he was with appellant when appellant kidnapped Coon and then drove Coon to a deserted, wooded area and murdered him. Wanting to finish Ellison's interrogation, Detective Baxter dispatched two sergeants who were on duty at the police station to go to appellant's place of work, which was at a car dealership, and arrest appellant. Detective Baxter advised the sergeants that appellant was about to get off work and should be considered dangerous. These sergeants knew no other details of the case at that time. The sergeants went to the dealership, along with two uniformed officers, and arrested appellant in the parking lot of the dealership. Appellant was immediately taken to the police station, where Detective Baxter read appellant his Miranda[11] rights. Based on this record, we find that the trial court acted within its discretion in finding that the arresting officers acted reasonably in not advising appellant of the charges against him at the time of his arrest. Johnson v. State, 660 So.2d 648, 659 (Fla.1995).
Upon arrival at the police station, Detectives Baxter and Roberts conducted the interrogation of appellant. Detective Baxter had done the major part of the investigation and had taken the statement from Ellison. Detective Baxter testified that when he first walked into the room appellant stated that "one of the other officers said something about a homicide." Detective Baxter testified that he told appellant to "wait a minute" because "before he made any other statements to me, I wanted to make sure he knew his rights." Detective Baxter then went through the routine of advising appellant of his constitutional rights.
Appellant contends that he did not understand his rights. After waiving his constitutional rights and while giving his oral statement, appellant asked Detective Roberts to stop taking notes. Appellant now argues that he was under the impression that his statements could not be used against him if the police did not take notes. We reject this *155 argument. Appellant signed a constitutional rights form which expressly provided that "[a]nything you say can be used against you in court." Furthermore, after giving his oral statement, appellant gave a written statement. Based upon the record, we find that the trial court was within its discretion in determining that appellant understood his rights. Sliney v. State, 699 So.2d 662, 668 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1079, 140 L.Ed.2d 137 (1998).
Next, appellant argues that his statements were not voluntary because the statements were induced by a "Christian burial speech." Appellant further asserts that the confession was induced by improper promises. Detective Baxter testified at the suppression hearing:
A. I related to Pressley Alston that Ms. Coon obviously needed closure in this case. Again, my viewpoint or perspective at that time was trying to get him to show us where the body was, and this was after I told him I didn't really care whether he confessed, just take me to the body. I felt Mrs. Coon needed closure because her son was still missing, and I expressed the things about his daughter. I said, "You have a daughter. The fact if somebody has taken your daughter and you don't see her again, you don't get any closure, so I think so it's important from Mrs. Coon's aspect if you can take us to his body, that would give her some closure in her son's death."
Q. But you didn't promise him anything in taking you to the body?
A. Certainly not.
Q. You were appealing to his conscience when you made these statements about Ms. Coon?
A. I wasn't appealing to nothing, I was just trying to be truthful with him.
Q. Did you tell him Ms. Coon would appreciate it if he took you to his body?
A. No, I just told himI just spoke of closure. Again, I'm not speaking for [the prosecutor], and I'm not speaking for Ms. Coon.
Appellant also testified at the suppression hearing. He stated that when he refused to talk with the detectives, they told him that he would find himself on death row unless he cooperated. Appellant further testified that Detective Baxter told him that they did not need his confession because they had Ellison's signed confession and McIntyre was also prepared to testify against him. Appellant stated that in exchange for his divulging the location of the body, Detective Baxter promised that both he and Ms. Coon would testify on appellant's behalf at trial and that the State would be lenient. In accord with our decisions in respect to a similar contention in Hudson v. State, 538 So.2d 829, 830 (Fla.1989), and Roman v. State, 475 So.2d 1228, 1232 (Fla.1985), we do not find Detective Baxter's statement that appellant should show them where the body was located because Ms. Coon needed closure was sufficient to make an otherwise voluntary statement inadmissible. Nor do we find that the trial court abused its discretion in finding that appellant's statements were not induced by improper police promises. In Escobar v. State, 699 So.2d 988, 993-94 (Fla.1997), we stated:
A trial court's ruling on a motion to suppress is presumptively correct. When evidence adequately supports two conflicting theories, our duty is to review the record in the light most favorable to the prevailing theory. The fact that the evidence is conflicting does not in itself show that the State failed to meet its burden of showing by a preponderance of the evidence that the confession was freely and voluntarily given and that the rights of the accused were knowingly and intelligently waived.
Id. (citations omitted). Applying these principles here, we find no error in the trial court's ruling that appellant's statements were freely and voluntarily given to police after appellant knowingly and intelligently waived his Miranda rights.
Appellant's second claim is that the trial court erred in denying appellant's pretrial motion to exclude the videotape of the "walk-over" from the police station to the jail on the morning of May 26, 1995. The audio portion of the tape provided in relevant part:

*156 Reporter: Did you do it? Did you know who he was?
[Appellant]: Huh?
Reporter: Did you know who Mr. Coon was?
[Appellant]: No, I didn't know who he was.
Reporter: They got the wrong guy?
[Appellant]: They got the right one.
Reporter: So you did it? Did you admit to it?
[Appellant]: Naw, I ain't admit to it, but under the circumstances 
Reporter: Whatwhat kind of circumstances, pal? Why'd you do it?
[Appellant]: He was just a victim of circumstance.
Reporter: Just somebody you came across?
[Appellant]: Just a victim of circumstance.
Reporter: And that's it, huh?
[Appellant]: That's it.
Reporter: Got any remorse, any regrets?
[Appellant]: I got a whole lot.
Reporter: Got a whole lot of what?
[Appellant]: Regrets, remorse.
Reporter: Doesn't help him out now, does it?
[Appellant]: Naw, It ain't gonna help me either. It ain't gonna help me either when I get to death row.
Reporter: What'd you like to say to his mother, his family?
[Appellant]: I can't say that I'm sorry. I can't say that. Um, I really can't say nothing, `cause I don't know what they would accept.
Reporter: You can't what?
[Appellant]: I really can't say anything, `cause I don't know what they would accept. They probably wouldn't wanta hear a mananything from a man like me.
Want me to smile?
Reporter: You think it's funny?
[Appellant]: Naw. Naw, I don't think it's funny.
Appellant argued that the videotape was irrelevant or, in the alternative, that the unfair prejudice to appellant substantially outweighed any probative value of the evidence. Appellant also argued that the videotape misrepresented him because it distorted his appearance and attitude. In denying the motion to suppress the videotape, the trial court found:
The Court has balanced the interests under 403, because that really is the gravamen of the motion. The court finds that the evidence is compelling and highly probative of the issues in this case. Indeed, the conduct of the defendant at the time that he talked to the reporters indicates consciousness of guilt, and the prejudicial effect does not outweigh the probative value under the balancing test under 403.
A trial judge's ruling on the admissibility of evidence will not be disturbed absent an abuse of discretion. Kearse v. State, 662 So.2d 677, 684 (Fla.1995); Blanco v. State, 452 So.2d 520, 523 (Fla.1984). We agree with the trial court that the substance of what was said on the videotape concerned the crime for which appellant was charged and tended to prove a material fact; thus it was relevant evidence as defined by section 90.401, Florida Statutes (1995).[12] In respect to the objection based upon section 90.403, Florida Statutes (1995),[13]Williamson v. State, 681 So.2d 688, 696 (Fla.1996), cert. denied, 520 U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 708 (1997), is applicable. In Williamson, we recognized that proper application of section 90.403 requires a balancing test by the trial judge. Only when the unfair prejudice substantially outweighs the probative value of the evidence must the evidence be excluded. The trial court's decision on *157 this issue conforms with our determination in Williamson, and we find no abuse of discretion in admitting the evidence.
Appellant argues that our decision in Cave v. State, 660 So.2d 705 (Fla.1995), should be applied to this case. We do not agree. The videotape in Cave was altogether different from the videotape in this case. In Cave, the videotape was a video reenactment of portions of the crime which was introduced in a penalty-phase only proceeding. We concluded in Cave that the reenactment video was irrelevant, cumulative, and unduly prejudicial. In contrast, the video in this case was not a reenactment and was relevant to the issue of appellant's guilt, and the trial court properly performed the balancing test pursuant to section 90.403, Florida Statute (1995).
In his third issue, appellant alleges that the trial court erred in denying a defense request to inform the jury that he was taking psychotropic medication. Prior to trial, defense counsel filed a motion pursuant to Florida Rule of Criminal Procedure 3.210 suggesting that appellant was incompetent to proceed to trial. The motion alleged that appellant was exhibiting inappropriate behavior; that appellant was extremely depressed; and that appellant was not understanding his own counsel's advice, in that appellant continued to believe that the police were his friends. Based upon these allegations, the trial court ordered appellant to be examined by two medical mental health experts. The report of the experts declared that appellant was competent to proceed to trial. Based on this report, the trial court adjudicated appellant competent to proceed to trial.
Later, defense counsel filed a motion pursuant to Florida Rule of Criminal Procedure 3.215(c) requesting that the trial judge give the jury at the beginning of the trial the following instruction:
[Appellant] is being administered psychotropic medication under medical supervision for a mental or emotional condition. Psychotropic medication is any drug or compound affecting the mind, behavior, intellectual functions, perception, moods, or emotion and includes anti-psychotic, anti-depressant, anti-manic, and anti-anxiety drugs.
At the pretrial hearing on the motion, the trial court stated that rule 3.215(c) is triggered only when there is a prior adjudication of incompetency or restoration, or when a defendant exhibits inappropriate behavior and it is shown that the inappropriate behavior is a result of the psychotropic medication. The court then deferred ruling on the motion to see what type of behavior appellant exhibited at trial.
At trial, following an outburst by appellant outside the presence of the jury, defense counsel renewed the motion for the abovementioned instruction. The court denied the request, noting:
I have kept an eye on Mr. Alston throughout the proceedings, I have not seen any bizarre or inappropriate behavior. I'm looking for it, as I indicated earlier, and he's just showing the normal range of reactions of a person accused of a crime, and your request is denied.
Appellant claims this ruling was reversible, fundamental error and cites to Florida Rule of Criminal Procedure 3.215(c)(2) and Rosales v. State, 547 So.2d 221 (Fla. 3d DCA 1989), for support. Rule 3.215(c)(2) provides:
(c) Psychotropic Medication. A defendant who, because of psychotropic medication, is able to understand the proceedings and to assist in the defense shall not automatically be deemed incompetent to proceed simply because the defendant's satisfactory mental condition is dependent on such medication, nor shall the defendant be prohibited from proceeding solely because the defendant is being administered medication under medical supervision for a mental or emotional condition.
....
(2) If the defendant proceeds to trial with the aid of medication for a mental or emotional condition, on the motion of defense counsel, the jury shall, at the beginning of the trial and in the charge to the jury, be given explanatory instructions regarding such medication.
We agree with the trial court's decision concerning the application of rule 3.215(c)(2). *158 The plain language of this rule requires an instruction on psychotropic medication only when the defendant's ability to proceed to trial is because of such medication. Appellant's motion requesting the medication instruction did not allege that appellant was able to proceed to trial because of the psychotropic medication. Nor was there any such evidence before the court in the competency proceeding. The motion simply asserted that appellant was on psychotropic medication. This assertion alone was insufficient to require an instruction on psychotropic medication. Accordingly, under these circumstances, we find no error in the refusal to give the requested instruction.
This case is distinguishable from the case before the Third District in Rosales, upon which appellant relies. Rosales spent seventeen years in and out of mental hospitals with the last three hospitalizations taking place within one year of the crime for which Rosales was charged. On at least two occasions, Rosales was adjudicated mentally ill under the Baker Act[14] and involuntarily committed. In addition, several doctors testified that Rosales suffered from paranoid schizophrenia; that Rosales did not know right from wrong at the time of the murder; and that Rosales was insane at the time of the murder. Most importantly, a psychiatrist testified that Rosales was competent to stand trial because of the medication. In this case, there is no extensive history of mental illness, and appellant was unqualifiedly adjudicated competent to proceed to trial by two medical experts. However, even if we concluded that the trial court erred in failing to give the requested instruction, we would find that such error was harmless beyond any reasonable doubt in this case, in that there is no evidence that appellant's taking the medication had any effect adverse to appellant during the trial.
In his fourth issue, appellant alleges that the trial court abused its discretion by allowing Dr. Floro, a qualified expert in forensic pathology, to testify as to the identification of the victim based upon methods of forensic odontology and upon the victim's dental records, which appellant argues were hearsay. Dr. Floro testified that he was able to identify the skeletal remains as those of Coon by comparing antemortem dental x-rays provided by Coon's dentist with postmortem dental x-rays. Dr. Floro testified that his conclusion was reached in conjunction with a forensic odontologist. Appellant claims that this testimony was inadmissible because Dr. Floro was not a qualified expert in forensic odontology and that the dental records themselves were inadmissible hearsay. We do not agree. We find that the trial court did not abuse its discretion in allowing Dr. Floro to express his opinion as to the identification of the body and that Dr. Floro's reliance on Coon's antemortem dental records was permissible under section 90.704, Florida Statutes (1995).[15] Moreover, even if we concluded that the admission of this testimony was error, we would find the error harmless beyond a reasonable doubt because other evidence adequately established the identity of the remains as those of Coon.[16]
In his fifth issue, appellant argues that the trial court should have granted his motion for acquittal as to the armed robbery count because there was insufficient evidence to sustain his conviction. A judgment of conviction comes to us with a presumption of correctness. Terry v. State, 668 So.2d 954, 964 (Fla.1996). The State presented appellant's written confession in which appellant stated that he and Ellison stopped Coon with the intent to rob him. Appellant also stated that he and Ellison *159 took Coon's wallet while Coon was being held at gunpoint. The two then split the $80 to $100 contained inside. Competent, substantial evidence supports the trial court's ruling on this motion. We find no error.
In his sixth issue, appellant alleges that the trial court erred in failing to give an independent act instruction. Appellant argues that there was sufficient evidence to support his theory that Ellison was the primary planner and perpetrator of Coon's murder, and therefore appellant was entitled to the following special instruction:
If you find that the killing was committed by a person other than the defendant and that it was an independent act of the other person, not part of the scheme or design of a joint felony, and not done in furtherance of a joint felony, but falling outside of, and foreign to, the common design or the original collaboration, then you should find the defendant not guilty of felony murder.
At the charge conference, the trial judge denied the request for the special instruction finding that it was "argumentative and [that] it's covered by the standard jury instructions." We find that, on this record, the trial court did not abuse its discretion in denying this request. See Hamilton v. State, 703 So.2d 1038 (Fla.1997); Bryant v. State, 412 So.2d 347 (Fla.1982).
While not raised by appellant, we find that the record contains competent, substantial evidence to support the first-degree murder conviction, and we affirm the conviction. See Williams v. State, 707 So.2d 683 (Fla.1998); Sager v. State, 699 So.2d 619 (Fla.1997).
In his seventh issue, appellant alleges that the trial court erred in denying a defense request to delay the penalty-phase proceeding until his codefendant could be tried and sentenced. Two days prior to the penalty phase, appellant moved to have the penalty phase delayed until his codefendant, Ellison, could be tried and sentenced. Appellant argued that Ellison could provide substantial evidence relevant to appellant's penalty-phase proceedings.
We rejected a similar argument in Bush v. State, 682 So.2d 85 (Fla.), cert. denied, ___ U.S. ___, 117 S.Ct. 355, 136 L.Ed.2d 246 (1996). Bush was convicted of first-degree murder and was under a death warrant. In a postconviction motion, Bush argued that his execution should be stayed because his codefendant's sentence had been set aside and his resentencing was scheduled for a date after Bush's date of execution. Bush argued that new information could emerge from his codefendant's resentencing which would make a death sentence for Bush disproportional. We rejected that contention, noting the abundance of evidence in the record showing that Bush played a predominant role in the crime.
Similarly, the record here clearly demonstrates that appellant played a dominant role in Coon's murder. There is no reason to believe, given the fact that Ellison told police that it was appellant who shot Coon, that Ellison would have testified favorably to appellant. Based on this record, we find that the trial court did not abuse its discretion in denying appellant's motion for a continuance.
In his eighth issue, appellant contends that the trial court improperly instructed the jury during the guilt and penalty phases as to the relative roles of judge and jury in determining what appellant's sentence would be should the jury return a verdict of guilty on the first-degree murder charge. This claim has no merit. At the close of the guilt phase, the trial court instructed the jury from the standard criminal jury instructions. At the close of the penalty phase, the trial court gave the jury an instruction partially requested by appellant. Appellant argues that both jury instructions misled the jury as to the roles of the judge and jury in determining the appropriateness of a defendant's death sentence in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). We find no error in the instruction given at the conclusion of the guilt phase because the instructions given adequately stated the law. See Archer v. State, 673 So.2d 17, 21 (Fla.1996) ("Florida's standard jury instructions fully advise the jury of the importance of its role."). Likewise, we find no error in the instruction that the trial court gave at the conclusion of the *160 penalty phase because it too was an accurate statement of the law.
In his ninth issue, appellant alleges that the trial court erred in permitting victim-impact evidence to be presented to the jury. Specifically, appellant claims that the testimony of Sharon Coon, the victim's mother, exceeded the scope of testimony allowed under Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), and section 921.141(7), Florida Statutes (1995). We do not agree. We upheld similar testimony in Bonifay v. State, 680 So.2d 413 (Fla.1996). In any event, given the strong case in aggravation and the relatively weak case for mitigation, we find that the claimed error, if determined to be error, is harmless beyond a reasonable doubt. Windom v. State, 656 So.2d 432, 438 (Fla.1995).
In his tenth issue, appellant claims that the trial court's jury instruction on victim-impact evidence was erroneous. At the close of the penalty phase, the trial court issued the following instruction regarding victim impact evidence: "[Y]ou shall not consider the victim impact evidence as an aggravating circumstance, but the victim impact evidence may be considered by you in making your decision in this matter." We find that this instruction comports with Windom and Bonifay.
In his eleventh issue, appellant alleges that the trial court erred in permitting the State to exhibit a full-color, eleven-inch by fifteen-inch graduation photograph of the victim during its penalty phase closing argument. As in Branch v. State 685 So.2d 1250 (Fla.1996), cert. denied, 520 U.S. 1218, 117 S.Ct. 1709, 137 L.Ed.2d 833 (1997), we find no error in the use of the photograph.
In his issues twelve, thirteen, and fifteen, appellant alleges that the trial court erred in finding three of the five aggravators used to support his sentence of death. When reviewing aggravating factors on appeal, we recently reiterated the standard of review:
[I]t is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubtthat is the trial court's job. Rather, our task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.
Willacy v. State, 696 So.2d 693, 695 (Fla.) (footnote omitted), cert. denied, ___ U.S. ___, 118 S.Ct. 419, 139 L.Ed.2d 321 (1997).
First, appellant alleges that the trial court erred in finding that the murder was committed to avoid arrest. We disagree. To establish this aggravating factor where the victim is not a law enforcement officer, the State must show that the sole or dominant motive for the murder was the elimination of the witness. Sliney, 699 So.2d at 671; Preston v. State, 607 So.2d 404, 409 (Fla. 1992). Regarding this aggravator, the trial court found the following:
The aggravating circumstance specified in Florida Statute 921.141(5)(e) was established beyond a reasonable doubt in that the capital felony was committed for the purpose of avoiding or preventing a lawful arrest. The defendant and his accomplice took James Coon from a hospital where he had been visiting an ill relative, drove him to a part of town after taking personal property from him, and thereafter executed him because the defendant realized that James Coon could identify him and his accomplice. The purpose of the killing was to eliminate a witness to the kidnapping and robbery. This statutory aggravating circumstance was established beyond a reasonable doubt.
We find that the trial court applied the correct rule of law and that its factual findings regarding this aggravator are supported by competent, substantial evidence.
Appellant also challenges the trial court's finding of HAC. The trial court found as follows:
The aggravating circumstance specified by Florida Statute Section 921.141(5)(h) was established beyond a reasonable doubt in that the capital felony was especially heinous, atrocious, or cruel. This was not a "routine" robbery wherein the decedent was killed simultaneously with the robbery. James Coon was forced into his own *161 vehicle, spent more than thirty (30) minutes inside the vehicle with his two (2) assailants, repeatedly begged for his life, was taken out of the vehicle in a remote location in Jacksonville, and vividly contemplated his death for a minimum of thirty (30) minutes. The words of James Coon are haunting, "Jesus, Jesus, please let me live so I can finish college." The defendant's accomplice shot the decedent once, and it appears that this shot was not fatal. After the accomplice came back to the defendant who did not go out into the woods initially with the accomplice and the decedent, the defendant inquired as to whether James Coon was dead. The accomplice responded that he assumed that he was as he had shot him once.
Not content with this assurance from the accomplice, the defendant took the firearm from the accomplice and went to the victim who was alive, moaning, and James Coon held up his hand as if to fend off further attacks. The defendant then shot James Coon at least two (2) times, and there is no question that James Coon was then rendered dead. It is difficult for the court to imagine a more heinous, atrocious, or cruel manner of inflicting death upon an innocent citizen who just happened to be in the path of this defendant who was then a predator looking for money or other things of value.
Execution-style murders are not HAC unless the state presents evidence to show some physical or mental torture of the victim. Hartley v. State, 686 So.2d 1316 (Fla.1996), cert. denied, ___ U.S. ___, 118 S.Ct. 86, 139 L.Ed.2d 43 (1997); Ferrell v. State, 686 So.2d 1324 (Fla.1996), cert. denied, 520 U.S. 1173, 117 S.Ct. 1443, 137 L.Ed.2d 549 (1997). Regarding mental torture, this Court, in Preston v. State, 607 So.2d 404 (Fla.1992), upheld the HAC aggravator where the defendant "forced the victim to drive to a remote location, made her walk at knifepoint through a dark field, forced her to disrobe, and then inflicted a wound certain to be fatal." Id. at 409. We concluded that the victim undoubtedly "suffered great fear and terror during the events leading up to her murder." Id. at 409-10. In this case, we find that the trial court's findings are supported by competent, substantial evidence. Accordingly, we find no error with the trial court's legal conclusion that this murder was especially heinous, atrocious, or cruel.
Next, appellant claims that the trial court erred in finding that the State proved beyond a reasonable doubt that the murder was CCP. The trial court's order sets out the basis for its finding:
The aggravating circumstance specified by Florida Statute Section 921.141(5)(i) has been established in that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. The essential facts justifying the conclusion that this statutory factor has been established have been outlined in part. This was a crime of heightened calculation and premeditation. The defendant could have stopped at kidnapping and robbery. He could have taken the defendant's motor vehicle and other valuables and left James Coon to pursue his life as an exemplary citizen of this community. Instead the defendant confined James Coon in his own motor vehicle and forced James Coon to contemplate his death while the defendant decided what to do with him. Certainly the defendant had more than ample time to reflect upon his actions, and there was absolutely no suggestion that he was under the influence of any intoxicants or the domination or pressure of another. Indeed it appears that the defendant was with his brother, his accomplice, and they were celebrating the defendant's brother's sixteenth (16th) birthday. This was an outrageous crime without even a scintilla of evidence suggesting moral or legal justification. This statutory aggravating circumstance was established beyond a reasonable doubt.
Specifically, appellant argues that the State failed to prove the heightened premeditation element of CCP. In Jackson v. State, 648 So.2d 85, 89 (Fla.1994) (citations omitted), we delineated the elements of CCP:
[T]he jury must determine that the killing was the product of cool and calm reflection and not an act prompted by emotional *162 frenzy, panic, or a fit of rage (cold); and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.
Based on our review of the record, we find that the trial court did not err in finding that this murder was CCP. We have previously found the heightened premeditation required to sustain this aggravator where a defendant has the opportunity to leave the crime scene and not commit the murder but, instead, commits the murder. See Jackson v. State, 704 So.2d 500, 505 (Fla.1997). In this case, as the trial court properly pointed out, appellant had ample opportunity to release Coon after the robbery. Instead, after substantial reflection, appellant "acted out the plan [he] had conceived during the extended period in which [the] events occurred." Jackson. Accordingly, we find that the trial court did not err in finding CCP.
In his fourteenth issue, appellant contends that the trial court erred by giving insufficient weight to the mitigating factors. This argument has no merit. In this case, the trial court wrote a detailed sentencing order, and the weight to be given to the mitigation evidence was within the trial court's discretion. See Bonifay, 680 So.2d at 416; Foster v. State, 679 So.2d 747 (Fla. 1996); Campbell v. State, 571 So.2d 415, 419 (Fla.1990). To be sustained, the trial court's final decision in the weighing process must be supported by competent, substantial evidence in the record. Based on this record, we find that the trial court's decision is supported by competent, substantial evidence.
In his sixteenth issue, appellant alleges that the trial court erred in denying a defense motion to prohibit imposition of the death penalty because of appellant's mental age. Appellant presented Dr. Risch, a clinical psychologist, who testified that because of appellant's borderline IQ, his mental age was between thirteen and fifteen. Appellant reasons that if executing a person who is chronologically less than sixteen years old is unconstitutional, Allen v. State, 636 So.2d 494 (Fla.1994), it follows that it would be unconstitutional to execute a person whose mental age is less than sixteen years. This claim has no merit. We have previously upheld the constitutionality of a death sentence upon a prisoner with a mental age of thirteen. See Remeta v. State, 522 So.2d 825 (Fla.1988).
Moreover, the trial court did not abuse its discretion in rejecting this claim because the testimony regarding appellant's mental age was sufficiently rebutted by other evidence. Appellant was chronologically twenty-four years old at the time he killed Coon. Prior to trial, the trial judge ordered appellant to undergo a competency examination. Two mental health experts from the Department of Psychiatry at the University of Florida Health Science Center in Jacksonville, one of whom was a medical doctor, issued a joint report finding that appellant had a twelfth-grade education, that appellant's concentration and attention span were good, that appellant read adequately, and that appellant performed in "the average intellectual range per [the] RAIT test." During the penalty phase, Dr. Risch also testified that appellant's recognition recall and memory were normal, that appellant's word fluency was excellent, that appellant exhibited good cognitive flexibility, and that there was no evidence whatsoever of impulse control deficit or organic brain dysfunction. Appellant's employment supervisor testified that appellant was a "top producer" on the job.
Finally, appellant contends that his death sentence is disproportionate. We reject this contention. Based on our review of the aggravating and mitigating circumstances present in this case, we conclude that death is a proportionate penalty. See Ferrell v. State, 686 So.2d 1324 (Fla.1996); Hartley v. State, 686 So.2d 1316 (Fla.1996); Foster v. State, 679 So.2d 747 (Fla.1996).
In conclusion, we affirm appellant's first-degree murder conviction and sentence of death. We also affirm appellant's armed robbery conviction. We do not disturb appellant's armed kidnapping conviction or appellant's armed robbery and armed kidnapping *163 sentences, which appellant did not challenge.
It is so ordered.
HARDING, C.J., and OVERTON, SHAW, KOGAN and WELLS, JJ., concur.
ANSTEAD, J., concurs as to the conviction and concurs in result only as to the sentence.
NOTES
[1] Eyewitnesses to the incident called police. The defense stipulated that the Honda found abandoned behind the convenience store by police belonged to Coon.
[2] Detective Baxter testified that in appellant's oral confession, appellant stated that he handed Ellison the revolver once inside the vehicle.
[3] Neither appellant's written statement nor Detective Baxter's testimony regarding appellant's oral testimony reveals who drove from Heckscher Drive to the location on Cedar Point Road that led into the brush where Coon was eventually murdered. Equally unclear is Coon's exact position within the car from the time that they stopped on Heckscher Drive until they arrived at the location where Coon was murdered.
[4] The expert was able to make this statement based on the location of the bullet holes in Coon's skull. These holes were compared to where the bullets were found, and the expert concluded that Coon must have been lying down when shot in the head. Regarding the shot to the torso, the expert testified that Coon was probably shot in the back because there was a bullet hole in the back of the shirt and the bullet was found inside the shirt near the left front pocket. The expert could not state with reasonable medical certainty in which order the bullets were fired.
[5] § 921.141(5)(b), Fla. Stat. (1995).
[6] § 921.141(5)(d, f), Fla. Stat. (1995) (merged).
[7] § 921.141 (5)(e), Fla. Stat. (1995).
[8] § 921.141 (5)(h), Fla. Stat. (1995).
[9] § 921.141(5)(i), Fla. Stat. (1995).
[10] Appellant's claims are: (1) the trial court erred in not suppressing his confession; (2) the trial court erred in admitting into evidence the videotape of the "walk-over"; (3) the trial court erred in denying a defense request to inform the jury that appellant was taking psychotropic medication; (4) the trial court erred in permitting the medical examiner to testify as to the identification of the victim based upon methods of forensic odontology and upon hearsay records of victim's dental records; (5) the trial court erred in denying appellant's motion for judgment of acquittal as to the armed robbery count; (6) the trial court erred in failing to give an independent act instruction during the guilt phase of the trial; (7) the trial court erred in denying a defense request to delay the penalty phase proceeding until a codefendant could be tried and sentenced; (8) the trial court erred by improperly instructing the jury as to the relative roles of judge and jury; (9) the trial court erred in permitting victimimpact evidence to be presented to the jury; (10) the trial court erred in giving the jury instruction on victim-impact evidence; (11) the trial court erred in permitting a full-color graduation photograph of the victim to be exhibited to the jury during closing argument in the penalty phase; (12) the trial court erred in finding that the murder was committed to avoid arrest; (13) the trial court erred in finding that the murder was HAC; (14) the trial court erred by giving insufficient weight to appellant's mitigating factors; (15) the trial court erred in finding that CCP was proven beyond a reasonable doubt; (16) the trial court erred in denying a defense motion to prohibit imposition of the death penalty because of appellant's mental age; and (17) the death sentence is disproportionate.
[11] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[12] Section 90.401, Florida Statutes (1995), provides: "Relevant evidence is evidence tending to prove or disprove a material fact."
[13] Section 90.403, Florida Statutes (1995), provides in pertinent part: "Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."
[14] § 394.467, Fla. Stat. (1987).
[15] Section 90.704, Florida Statutes (1995), provides:

The facts or data upon which an expert bases an opinion or inference may be those perceived by, or made known to, the expert at or before the trial. If the facts or data are of a type reasonably relied upon by experts in the subject to support the opinion expressed, the facts or data need not be admissible in evidence.
[16] Darrylin and Derrick Council, uncles of Coon who had seen him at the hospital prior to his disappearance, testified that the clothes found at the scene matched those worn by Coon on the day he was last seen at the hospital. Also, by appellant's own admission, the body he led police to was that of Coon.