CAMPBELL, Acting Chief Judge.
Appellant, Grover Wayne Peavy, challenges his conviction and sentence for the first-degree murder of his wife, Catherine Peavy. We affirm.
It is uncontroverted that Mr. Peavy killed Mrs. Peavy by stabbing her to death on August 19, 1997, outside her workplace in Bartow, Florida. Mr. and Mrs. Peavy had been married approximately four years.
Mr. Peavy and his partner, Terry So-wards, ran a scrap metal business in Lake City, Florida, nearly 200 miles from Bar-tow. On the day the incident occurred, Mr. Sowards knew of no business Mr. Peavy had in Bartow, and in fact, the two men had planned to go to Georgia to obtain scrap metal for their business on that day. Nevertheless, on August 19, 1997, Mr. Peavy drove from Lake City to Mrs. Peavy’s office located at the Bartow Memorial Hospital Medical Center and confronted her outside the complex during her noon break. Several witnesses heard Mrs. Peavy’s screams for help. One witness testified that Mr. Peavy picked Mrs. Peavy up and threw her against a wall. Another witness saw Mr. Peavy kneeling over Mrs. Peavy while she was screaming and trying to protect herself. At least six witnesses testified to observing Mr. Peavy stab his wife with a knife several times. One witness testified that during the stabbing, Mr. Peavy called Mrs. Peavy a “bitch” and a “slut” and said, “you deserve to die.” On *1122 lookers rushed to the scene and two men yelled for Mr. Peavy to drop the knife. Three witnesses testified that Mr. Peavy responded by asking, “you want some of this,” while holding the knife in his hand. Shortly thereafter, Mr. Peavy released the knife to one of the witnesses.
The knife had a six-inch blade and was alternatively described as a “butcher knife” or a “fillet-type knife.” The medical examiner testified that Mrs. Peavy sustained nine knife wounds, at least two of which were fatal; one to her left breast and the other to her liver and diaphragm. Mr. Peavy was arrested at the scene by responding Bartow Police Department officers.
Mr. Peavy argues in this appeal that the evidence was insufficient to establish the premeditation element of first-degree murder. We reject that argument as being without merit.
Mr. Peavy next argues that the trial judge erred in failing to declare a mistrial because an answer by Bartow Police Detective Hunt to cross-examination by Mr. Peavy’s counsel was an intentional comment on Mr. Peavy’s right to remain silent. While we are not convinced that Detective Hunt’s answer to defense counsel’s question was completely unresponsive, we are convinced that even if it were unresponsive, it was unintentional and no harm occurred. The trial judge should be commended for alertly recognizing a potential problem and immediately acting to diffuse the situation. On the day Detective Hunt testified, he had been on duty without sleep the night before. On cross-examination, Detective Hunt was questioned by defense counsel regarding photographs of Mr. Peavy that he had taken at the Bartow Police Department as follows:
Q: Okay. And what I’d like to do is draw your attention to your activities in the case later in the day back at the police station, the photographs.
A: Right.
Q: Was that at about 1410 hours, about 2:10 in the afternoon?
A: Yes sir. Approximately 2:10 according to my report.
Q: And basically as far as Mr. Peavy’s facial expression at that time he maintained a blank stare throughout the photographs; is that right?
A: Yes sir. Mr. Peavy never made a statement to me at any point and he never showed any type of—
THE COURT: Wait. Wait now. We need to be sure he asks you a question before you tell us something. Okay.
DEFENSE COUNSEL: May we approach the bench, Your Honor?
THE COURT: Sure. Is now a good time for them to take a break, Mr. Trogolo?
DEFENSE COUNSEL: Yes sir.
THE COURT: Would you take the jury out.
THE BAILIFF: All rise, please.
(The jury was excused from the courtroom 3:00 p.m.)
THE COURT: My inclination is to ask this witness to go home and go to bed, get some sleep, come back tomorrow after he is well rested and testify. Disagree either one of you?
PROSECUTOR: Depending on the length of the cross. I’m not sure whether Mr. Trogolo is at on his cross-examination.
DEFENSE COUNSEL: I have some more cross-examination.
At this time I, you know, have to object to what he said. It was unresponsive. And move to strike it and move for mistrial.
THE COURT: It was unresponsive and the motion to strike is granted and the motion for mistrial is denied. And I would like to send him home to get some rest and he can come back and finish up when he has not — has not been up all night.
PROSECUTOR: We have no problem, Judge.
THE COURT: Any problem with that?
*1123 DEFENSE COUNSEL: I don’t have any problem with it.
THE COURT: That means I don’t want you to work tonight.
THE WITNESS: I’m not scheduled tonight.
THE COURT: Okay. Go home. Don’t talk to anybody. You’re on the witness stand. Don’t talk about what we did today. Go to bed and come back tomorrow. You’re first. Okay?
THE WITNESS: What time do I need to be here?
THE COURT: 9:00 o’clock.
[[Image here]]
THE BAILIFF: All rise, please.
(The jury returned to the courtroom 3:30 p.m.)
THE BAILIFF: You may be seated.
THE COURT: A Motion to Strike was made and granted. And you’re directed to disregard the testimony that the officer who was on the stand before him gave right before you left. If you don’t recall what it was that’s okay too. That’s the idea. Don’t let it figure into your verdict, please.
PROSECUTOR: For the record, we are speaking of the last question, Your Hon- or.
A subsequent witness was Bartow Police Officer Thomas Andrews, who responded to the scene of the crime. The following took place on direct examination of Officer Andrews without objection by defense counsel:
Q: Was the defendant placed in handcuffs?
A: Yes sir.
Q: Who did that?
A: I did.
Q: Did you smell any alcohol on the defendant’s body?
A: No sir.
Q: On his breath?
A: No sir. He never spoke.
On cross-examination, Officer Andrews was asked and he answered as follows:
Q: Sir, is it correct when you first saw Mr. Peavy he was being patted down by Detective Matos?
A: When I searched — first saw Mr. Peavy he was standing at the bed or walking. It appeared that he was a few feet away from the bed of the small pickup truck and he was walking towards the bed of that truck.
Q: Okay. And then when you got there did he assume the position to get patted down?
A: He placed his hands on the rail of the bed of the truck, yes sir.
Q: And were you where you couldn’t hear what the directions Detective Ma-tos and other officers were giving him there?
A: I couldn’t hear any conversation taking place at the vehicle.
He * * *
Q: And it’s correct that when you got up there Mr. Peavy had a blank look on his face; is that correct?
A: Yes sir.
Q: And he did not make eye contact with you; is that correct?
A: That’s correct.
Q: Basically what he did was look forward and down when you were there?
A: Yes sir.
Another Bartow Police Officer, David Wyant, who responded to the scene of the crime, testified without objection as to his contact with Mr. Peavy as follows:
Q: Was the defendant there when you got there?
A: Not to my knowledge, no sir.
Q: Was there a time, sir, when you had contact with the defendant?
A: Yes sir.
Q: Where did that take place?
A: At the Police Department.
Q: Did you talk to him?
A: Yes sir.
*1124 Q: Were you the officer in charge of booking in the defendant?
A: Yes sir. I conducted the book-in procedure.
Q: Okay. As part of the book-in procedure you have to ask him questions?
A: Yes sir.
Q: About his name?
A: Yes sir.
Q: His age?
A: Yes sir.
Q: How about his height and weight?
A: Yes sir.
Q: Color of eyes?
A: Yes sir.
Q: Color of hair?
A: Yes sir.
Q: And do you also fingerprint the defendant?
A: Yes sir.
Q: Did you do that?
A: Yes sir.
* * * *
Q: As part of the book-in procedures were you giving the defendant instructions?
A: Yes sir.
Q: Did he appear to understand the instructions?
A: Yes sir.
Q: Did you understand his responses? A: Yes sir.
Q: Did he have any odor of alcohol on his person or breath?
A: Not that I noticed, no sir.
Q: Did he appear to be under the influence of either drugs or alcohol?
A: No sir.
Q: Were you present when the defendant was notified about the death of Catherine Peavy?
A: Yes sir, I believe so.
Q: What has his reaction to that, physical reaction, if he had any?
A: I don’t remember him having any reaction really.
Q: How long were you in the proximity — in the vicinity of the defendant? The book-in procedure how long did that take?
A: Maybe five, ten minutes maybe. Not longer than that.
Q: He appeared coherent?
A: Yes sir.
In light of the testimony by the various officers concerning their contact with Mr. Peavy, we conclude that Detective Hunt’s comment that Mr. Peavy made no statement to him, was not fairly susceptible of being interpreted by the jury as a comment on Mr. Peavy’s right to remain silent. Even if it were considered otherwise, however, we conclude beyond any reasonable doubt that any error was harmless and did not contribute to the jury verdict. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
Appellant next argues that the admission of a witness’s testimony regarding telephone calls Mrs. Peavy received from Mr. Peavy several weeks before her death was error. We disagree. The words and tone of Mr. Peavy’s conversations could be considered threatening and were relevant to show his state of mind and motive.
Mr. Peavy further argues that the trial judge erred in refusing to instruct the jury pursuant to Florida Rule of Criminal Procedure 3.215(c)(2) that Mr. Peavy was being administered psychotropic medication. We disagree. Mr. Peavy’s competency was never in issue, and nothing occurred during trial to direct attention to any abnormal behavior of Mr. Peavy. Furthermore, there was no request at the beginning of trial for such an instruction. Any error was therefore harmless. See Alston v. State, 723 So.2d 148 (Fla.1998).
Mr. Peavy’s final issue concerns whether the State’s closing argument was so improper as to mandate a new trial. We conclude that while it was improper in part, it does not warrant a new trial. Mr. Peavy’s counsel had opening and closing argument. In his opening argument, Mr. Peavy’s counsel properly focused only on *1125 the premeditation issue and challenged the jury to consider whether Mr. Peavy’s actions were “reasonable” for a person planning to commit murder. In response, the State immediately argued as follows:
My answer is yes, it is very reasonable. And I’ll tell you why. But first let me say good morning.
^
The question is not whether it’s reasonable to you. The question is whether it was reasonable to the defendant. What did he want to do? He wanted to kill Cathy Peavy. Did he do that? Yes, he did. Did he care how? No, he did not. Did he care what kind of clothes he had on? No, he did not. Is it rational? Does it make sense? Well, I bet you as he sits here he probably says oh, boy, what the heck did I do.
The question is what happened on August 19th, 1997. And obviously it was reasonable for Cathy. She did not want to die.
You think about Danny Rolling, you think about Timothy McVey [sic], and you think about all the murders committed. None of that was reasonable. But Timothy McVey wanted to send a message.
DEFENSE COUNSEL: I would like to object to his analogy to any other cases that occurred outside of this courtroom and this particular case, Your Honor.
THE COURT: I think you’re treading in very dangerous territory and I would caution you not to do that.
PROSECUTOR: Thank you.
I’m asking, and we are asking you to apply your common sense when it comes to what is reasonable and what is not reasonable, what is rational and what is not rational.
But again there’s absolutely no question that the defendant Wayne, Grover Wayne Peavy, wanted Cathy Peavy dead and he did it. His mission was accomplished.
If you remember Thomas Hunt. He’s a lay witness who gave up his navy blue shirt when everybody was trying to help Cathy. He said there was’ a change, dramatic change, in his demeanor. That was when position his — his demeanor was the bitch deserves to die. And then he relaxed. He became less angry. His mission was accomplished.
Now is that reasonable? Do we like that? That’s not the issue here. That’s what he wanted to do on that day.
We conclude that the trial judge’s response to defense counsel’s objection to the State’s argument was the equivalent of sustaining the objection. Clearly, the objection was not overruled. Defense counsel did not pursue the matter further, and there was no request for a curative instruction or a mistrial. Because Mr. Peavy has not met his burden of demonstrating prejudice, we conclude that the State’s comments, while improper, were not so egregious as to deprive him of a fair trial. See Spencer v. State, 645 So.2d 377 (Fla.1994); Kearse v. State, 25 Fla. L. Weekly S507, — So.2d -, 2000 WL 854156 (Fla. June 29, 2000).
The other errors complained of regarding the State’s closing argument were either proper response, not preserved, or were not improper. We again admonish counsel for the State to not engage in “overkill.” There is no room in the legal profession for those who would constantly seek to tread upon the rules of proper conduct in order to achieve a particular result. Zealous advocacy is applaudable. Overzealous advocacy borders on misconduct.
Affirmed.
ALTENBERND and GREEN, JJ., Concur.