880 So.2d 561 (2004)
Faunce Levon PEARCE, Appellant,
v.
STATE of Florida, Appellee.
No. SC02-476.
Supreme Court of Florida.
July 1, 2004.
*564 Steven Herman, Zephyrhills, FL, for Appellant.
*565 Charles J. Crist, Jr., Attorney General, and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal a judgment of conviction of first-degree murder and attempted second-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the judgments and sentences.

FACTUAL AND PROCEDURAL HISTORY
Faunce Pearce was charged as a codefendant in the murder of Robert Crawford and in the attempted murder of Stephen Tuttle.[1] The following facts were revealed at Pearce's trial.
On the evening of September 13, 1999, Pearce visited Bryon Loucks at Loucks' home, which was also Loucks' place of business, a mobile home dealership known as We Shelter America. Pearce worked for the business by setting up mobile homes. Pearce was looking for Loucks' teenage stepson, Ken Shook, in order to obtain LSD (lysergic acid diethylamide) geltabs. Shook called two friends, Stephen Tuttle and Robert Crawford, who in turn called another friend, Amanda Havner. Havner contacted her source for drugs, Tanya Barcomb, who said she could obtain the geltabs. Tuttle, Crawford, and Havner then went to Loucks' business, where Pearce gave them $1200 to obtain a book of 1000 geltabs. Pearce indicated that they should not return without either the money or the drugs. Shook, Tuttle, Crawford, and Havner went to Barcomb's house, where Barcomb indicated that she, her boyfriend, and Havner would obtain the drugs from a supplier while the three boys remained behind. After arriving at an apartment complex, Barcomb told Havner to stay in the car. Barcomb and her boyfriend entered a friend's apartment. The boyfriend hid the money in his own shoe and punched himself in the face. When Barcomb and her boyfriend returned to the car, they told Havner that their drug supplier stole the money. Because of Barcomb's deception, Shook, Tuttle, Crawford, and Havner eventually were forced to return to Loucks' business without the money or the drugs.
While the teenagers were gone, Pearce and Loucks received a telephone call from Barcomb explaining that Pearce's money had been stolen. Pearce became very angry and was standing outside with a gun visibly tucked in his pants when the four teenagers returned shortly thereafter. As Shook, Tuttle, Crawford, and Havner exited the car, Pearce waved the gun and ordered them inside Loucks' business office. This business location was surrounded by a twelve-foot fence, topped with barbed wire. The fence also had a locked gate. Pearce confined Loucks and the four teenagers at this location for an unknown period of time. During this confinement, the witnesses described Pearce's mood as swinging between calm and threatening. Pearce refused to allow anyone to leave and, at various times, waved his gun at the confined individuals. Havner made some phone calls in a futile *566 attempt to recover Pearce's money. At one point, Pearce grabbed Havner by the throat and slammed her head against a wall. He also pointed the gun at Havner and threatened to shoot her in the head. Pearce eventually allowed Havner to leave when her brother arrived at the business location. At another point, Pearce took Tuttle outside and forced him at gunpoint to perform oral sex upon him.
At some point, Pearce called his friend Theodore Butterfield, and requested that Butterfield come armed to Loucks' business. Pearce also requested that Butterfield bring Lawrence Joey Smith with him. Heath Brittingham, who was at the house with Butterfield, accompanied Butterfield and Smith. When Butterfield, Smith, and Brittingham arrived at Loucks' business, they were visibly armed. Smith stated, "We're here to do business." According to Tuttle, Pearce spoke with these three men outside. Brittingham also testified that Pearce and Smith spoke to each other, but he was not able to hear their conversation. Pearce told the three men that Tuttle and Crawford were going to show them where to find the people who had stolen Pearce's money. While still holding his gun, Pearce told Tuttle and Crawford to get in his car. Loucks refused to allow Pearce to take his stepson, Shook. Loucks also offered to drive Tuttle and Crawford to their homes and to get Pearce his money in the morning. Pearce refused, but told Loucks he was not going to hurt the boys  only take them down the road, punch them in the mouth, and make them walk home. Pearce instructed Loucks to wait by the phone to hear from the boys.
Pearce, Smith, Butterfield, Brittingham, Tuttle, and Crawford left in Pearce's car, a two-door Trans Am with a t-top. Pearce drove the car and Smith sat in the front passenger seat. Tuttle sat on Crawford's lap in the middle of the backseat, with Butterfield and Brittingham seated on both sides of the boys. After driving south on Highway 41 in Pasco County, Pearce turned right on State Road 54 and drove to a dark, desolate area. According to Butterfield's testimony, sometime during this drive Smith told Pearce that his 9 mm pistol was jammed and the two men exchanged guns, with Smith receiving Pearce's functional .40 caliber pistol. Brittingham also testified that Pearce and Smith exchanged guns during the drive.
Pearce stopped the car along the side of the road and told Tuttle to get out of the car. Smith first exited from the passenger's side and stood between the door and the car while Tuttle exited the backseat on the passenger's side. Pearce told Smith either to "break [Tuttle's] jaw" or "pop him in the jaw for stealing my shit," to which Smith replied, "Fuck that." Smith then turned around and shot Tuttle once in the back of the head. When Smith got back in the car, Pearce asked, "Is he dead?," and Smith replied, "Yeah, he's dead. I shot him in the head with a fucking .40." Pearce then drove approximately two hundred yards down the road, stopped the car, and Smith exited the vehicle again. Pearce ordered Crawford out. Crawford complied while pleading, "No. Please no." Smith shot Crawford twice: in the head and in the arm.
After leaving the scene, Smith threatened to kill Butterfield and Brittingham if they "snitched" on him. Pearce drove to a restaurant where he and Smith ate breakfast. Pearce and Smith left Butterfield and Brittingham at a grocery store, telling them not to leave, and returned for them within an hour. Pearce then drove to the Howard Frankland Bridge over Tampa Bay, where Smith wrapped the .40 caliber pistol in newspaper and threw it in the water. Shortly thereafter, the four men split up. Smith attempted to leave town *567 by bus but was unable to do so because of an approaching hurricane.
Tuttle survived the gunshot to his head. At trial, he testified that he remembered getting out of the car and then everything went black. His next memory was waking up on the side of the road. He felt the hole in his head, but did not remember being shot or who shot him. He eventually flagged down a passing motorist for assistance. Crawford, however, died at the scene. The medical examiner testified that Crawford's injuries suggested that he was shot first in the arm, with that bullet traveling through his body and lodging in his throat; that the gunshot wound to Crawford's head, which was fatal, entered the right side of Crawford's head about four inches above his ear and exited the left side; and that Crawford would have lost consciousness fifteen to twenty seconds after the shot to his head and died within two to five minutes.
The entire course of these events occurred during the evening of September 13, and into the morning of September 14, 1999. That morning, Butterfield and Brittingham were located and interviewed by police. Smith was arrested on the same day, and Pearce was located and arrested a few weeks later. The murder weapon, Pearce's .40 caliber pistol, was recovered from the location in Tampa Bay where Butterfield stated that Smith had thrown it. The bullets removed from Tuttle and Crawford were matched to the same pistol.
Butterfield and Brittingham agreed to cooperate with the State in exchange for not being charged with any crimes related to these offenses. Both testified at trial. During the cross-examination of Brittingham, Pearce's counsel attempted to offer a videotape of a prior statement that Brittingham made to an investigating officer. This prior statement was offered as impeachment evidence, but the court denied its introduction. A transcript of the videotape was proffered by the defense. In this videotaped statement, Brittingham stated that Pearce had no knowledge of Smith's intention to shoot the victims and that Pearce had asked Smith what he was doing when he shot the victims.
Pearce did not testify or present any evidence during the guilt phase. Pearce was convicted of first-degree murder with a firearm for Crawford's death and attempted second-degree murder with a firearm for the shooting of Tuttle. During the penalty phase, the State relied upon the evidence presented in its case in chief. Pearce chose not to testify or present penalty phase argument. The jury recommended death by a vote of ten to two.
During the Spencer[2] hearing, Pearce declined to present evidence or argument and forbade his attorneys to do so. In imposing sentence, the trial court considered a handwritten letter from Pearce, letters from family members of Crawford, a comprehensive presentence investigation, and several hundred pages of court, criminal, school, and other records pertaining to Pearce. The trial court found three aggravating factors: a previous conviction of a violent felony, based on the attempted murder of Tuttle (given great weight); that the murder was committed while engaged in kidnapping (given great weight); and that the murder was cold, calculated, and premeditated without any pretense of moral or legal justification (given great weight). See § 921.141(5)(b), (d), (i), Fla. Stat. (2001). The trial court found no statutory mitigating factors. While Pearce requested no nonstatutory factors, the trial court considered a number of factors based on claims in Pearce's correspondence *568 to the court. The trial court concluded that two of Pearce's claims (that he was afraid of Smith and only participated in the murder because of this fear, and that the State witnesses lied) were actually claims of lingering doubt and would not be considered as mitigating factors. The trial court also discounted Pearce's claim that Crawford was killed because of his involvement in an illicit drug deal and Pearce's complaints about the conduct of his trial. The trial court noted that a teenager's foolish involvement with the illicit drug culture did not warrant his death and that any complaints about the trial proceedings could be raised during appellate review. The trial court did find Pearce's good conduct in jail to be a mitigating factor, but only entitled to little weight. The trial court concluded that the aggravating factors far outweighed the mitigating factors and imposed a death sentence.

ISSUES ON APPEAL
In his direct appeal to this Court, Pearce raises five issues, three challenging the guilt phase proceedings of his trial and two directed at the penalty phase proceedings. Pearce claims that the trial court erred: (1) by refusing to allow defense counsel to impeach State witness Brittingham with a previous videotaped statement; (2) in denying his motion for judgment of acquittal on first-degree murder on the element of premeditation; (3) in denying his motion for judgment of acquittal on felony murder; (4) in finding the aggravating circumstance that the murder occurred during the course of a kidnapping; and (5) in finding the cold, calculated, and premeditated (CCP) aggravating circumstance.

Impeachment Evidence of Witness
During cross-examination of State witness Heath Brittingham, defense counsel asked Brittingham if he had previously told the investigating detective that Pearce expressed surprise after Smith shot Tuttle. When Brittingham responded that he did not remember saying that, defense counsel requested that a videotape of a previous statement by Brittingham be shown to the jury. The judge responded that the defense would have to present the tape in its own case, not during the State's case. After the State rested its case, Pearce moved for judgment of acquittal, which was denied by the judge. When the judge asked if the defendant intended to present testimony or evidence, defense counsel stated his intent to present the videotape of Brittingham's statement as impeachment evidence. Defense counsel then proffered the testimony of the technician who had videotaped the interview. The technician stated that although she operated the video camera, she did not pay attention to the various interviews conducted by the detective, had not viewed the videotape in question, and could not authenticate its contents. Defense counsel also proffered the testimony of the investigating detective who conducted the interview. After viewing the videotape, the detective testified that it fairly and accurately depicted his interview with Brittingham. Defense counsel specified that he wanted admitted into evidence a part of the videotaped interview in which Brittingham stated that Pearce had expressed surprise after Smith shot Tuttle by stating, "What the hell? What are you doing?" and that Smith directed Pearce either to "go, go" or "drive, drive" after Smith shot Tuttle. Defense counsel argued that this was impeachment evidence that should be admitted. The State objected, arguing that the defense could not impeach Brittingham's response of "I don't recall" or "I don't remember."
The trial court did not permit Pearce to introduce Brittingham's previous videotaped statement into evidence, even for impeachment purposes, but allowed defense *569 counsel to proffer the videotape for the record after the State rested its case. The trial court ruled that the tape did not meet the requirements of the Florida Evidence Code for impeachment purposes.
In order to resolve this claim, we must examine the law relating to the admissibility of prior inconsistent statements. Prior inconsistent statements are not hearsay and can be admitted as substantive evidence "if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is ... [i]nconsistent with the declarant's testimony and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition." § 90.801(2)(a), Fla. Stat. (2001) (emphasis added). However, in State v. Delgado-Santos, 497 So.2d 1199 (Fla.1986), this Court held that a statement given under oath during a police investigation is not a statement given at an "other proceeding" and consequently is not admissible as substantive evidence under section 90.801(2)(a). See also Ellis v. State, 622 So.2d 991, 997-98 (Fla.1993) (concluding that pretrial statement by witness during interview with prosecutor could not be admitted as substantive evidence under section 90.801(2)(a) because the interview was not an "other proceeding" within the meaning of the rule). Thus, the videotaped statement that Brittingham gave to the investigating detective did not meet the last requirement of section 90.801(2)(a) and could not be admitted as substantive evidence here.
However, introduction of a prior statement that is inconsistent with a witness's present testimony is also one of the main ways to attack the credibility of a witness. See § 90.608(1), Fla. Stat. (2001); see also Charles W. Ehrhardt, Florida Evidence § 608.4 (2002 ed.). "The Florida Evidence Code does not require the witness's prior inconsistent statement to be reduced to writing in order to impeach the witness under section 90.608(1)(a)." Kimble v. State, 537 So.2d 1094, 1096 (Fla. 2d DCA 1989). The theory of admissibility is not that the prior statement is true and the in-court testimony is false, but that because the witness has not told the truth in one of the statements, the jury should disbelieve both statements. See Florida Evidence § 614.1. To be inconsistent, a prior statement must either directly contradict or be materially different from the expected testimony at trial. The inconsistency must involve a material, significant fact rather than mere details. See State v. Smith, 573 So.2d 306, 313 (Fla.1990). "Nit-picking" is not permitted under the guise of prior inconsistent statements. See Morton v. State, 689 So.2d 259, 264 (Fla.1997) ("[C]aution should be exercised in permitting impeachment of a witness who has given favorable testimony but simply fails to recall every detail unless the witness appears to be fabricating."), receded from on other grounds Rodriguez v. State, 753 So.2d 29 (Fla.2000) (receding from Morton to extent it holds that a prior inconsistent statement cannot be used as substantive evidence in a penalty phase proceeding); see also Florida Evidence § 608.4. If a witness has made a prior inconsistent statement concerning a collateral matter, cross-examining counsel may question the witness about the statement, but must "take the answer" and cannot present extrinsic evidence to prove the prior inconsistent statement. Florida Evidence § 608.4.
Before a witness can be impeached with a prior inconsistent statement, the proper foundation must be laid. Prior to questioning a witness about the contents of a previous inconsistent statement, counsel must call to the witness's attention the time, place, and person to *570 whom the statement was allegedly made. Rowe v. State, 128 Fla. 394, 174 So. 820, 821 (1937); see also Florida Evidence § 614.1. As provided in section 90.614(2),
Extrinsic evidence of a prior inconsistent statement by a witness is inadmissible unless the witness is first afforded an opportunity to explain or deny the prior statement and the opposing party is afforded an opportunity to interrogate the witness on it.... If the witness denies making or does not distinctly admit making the prior inconsistent statement, extrinsic evidence of such statement is admissible.
Thus, if the witness admits making the prior statement, examining counsel may not offer any evidence to prove the statement was made. See Jennings v. State, 512 So.2d 169, 172 (Fla.1987) (explaining that sworn pretrial motions, containing statement of a state witness which was inconsistent with his trial testimony, were not admissible for impeachment, where witness admitted making the prior inconsistent statement). Further, even if the witness admits making a prior statement, the witness should be given an opportunity to explain it, show that he or she was mistaken when it was made, or explain that the prior statement is not inconsistent.
Under section 90.614(2), extrinsic evidence is admissible when a witness does not "distinctly admit" making the prior statement. See Pugh v. State, 637 So.2d 313, 314 (Fla. 3d DCA 1994) (finding error in not admitting prior inconsistent portions of witness's deposition into evidence when witness stated that "he did not remember the questions he was asked nor the answers he gave during his deposition"). If the witness does not distinctly admit making a prior statement, then when it is counsel's turn to offer evidence, he or she may introduce extrinsic evidence that the statement was made. See Florida Evidence, § 614.1. This evidence can include a properly authenticated written statement and the testimony of individuals who were present when the statement was made. See id. § 608.4.
The record in this case shows that defense counsel laid the proper foundation under section 90.614(2): counsel called to Brittingham's attention the time, place, and person to whom he made the prior inconsistent statements, quoted from the prior statements, and gave Brittingham an opportunity to explain his prior statements. See Brumbley v. State, 453 So.2d 381, 385 (Fla.1984) (finding it proper for State to impeach witness by quoting the precise language of his prior statements as "such references were a correct method of laying a predicate for the introduction of the prior statements"). Further, the prior statements and Brittingham's in-court testimony were relevant to the issue of Pearce's level of involvement in the shootings. When Brittingham did "not distinctly admit making the prior inconsistent statement, extrinsic evidence of such statement [was] admissible." § 90.614(2), Fla. Stat. (2001). Thus, the trial court erred by not permitting defense counsel to admit extrinsic evidence of Brittingham's prior statement.
However, we conclude that the error in excluding this evidence was harmless beyond a reasonable doubt in this case. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). The evidence was only admissible for purposes of impeaching Brittingham's credibility, not as substantive evidence of Pearce's level of involvement in the killings or his prior knowledge of Smith's intentions when he shot the victims. While the videotape itself was not admitted into evidence, defense counsel did call Brittingham's credibility into question before the jury when he quoted directly *571 from Brittingham's previous statements. Further, even if Brittingham's credibility had been called into question by the admission of his prior inconsistent statements, Brittingham's account of the evening (i.e., that Pearce played the primary role in the kidnappings) was corroborated in every significant detail by the testimony of Butterfield, Tuttle, Loucks, Shook, and Havner. Cf. Garcia v. State, 816 So.2d 554, 563 (Fla.2002) (finding that exclusion of relevant impeachment evidence of key state witness was harmful where no physical evidence linked the defendant to the murder scene or murders and witness's credibility was critical to strength of State's case). Butterfield's testimony recounted the same conversation between Pearce and Smith after Tuttle was shot as Brittingham did during his in-court testimony, i.e., Pearce sought assurance from Smith that Tuttle was dead but there was no other conversation. More importantly, Brittingham's prior statement to the detective, Brittingham's in-court testimony, and Butterfield's in-court testimony were consistent as to the events and conversation that preceded Crawford's shooting, which is the basis for Pearce's first-degree murder conviction and death sentence. There was no evidence of any discussion between Pearce and Smith when Pearce stopped the car the second time and ordered Crawford out of the car. Pearce never distanced himself from Smith's previous actions of shooting Tuttle and leaving him for dead. Notably, Pearce never told Smith not to kill or shoot Crawford when he stopped the car the second time, even though he thought that Smith had already killed Tuttle. There was also direct testimony and physical evidence that tied Pearce to the kidnappings, the shootings, and the murder of Crawford. Thus, the cases relied upon by Pearce are distinguishable as Pearce's conviction did not rest solely or even primarily on the testimony of Brittingham. Cf. Pugh v. State, 637 So.2d 313, 314 (Fla. 3d DCA 1994) (finding that error in not admitting portion of pretrial deposition as prior inconsistent statement to impeach key prosecution witness was not harmless as this was only witness to claim defendant was directly involved in robbery and holding gun); Kimble v. State, 537 So.2d 1094, 1096 (Fla. 2d DCA 1989) (same as to prior inconsistent statement of witness-victim).
Thus, we conclude that any error in excluding extrinsic evidence of Brittingham's prior inconsistent statements was harmless beyond a reasonable doubt under the facts of this case. DiGuilio, 491 So.2d at 1135.

Denial of Judgment of Acquittal on Premeditation
After the State rested its case, Pearce moved for a judgment of acquittal on the first-degree murder charge, arguing that there was insufficient evidence to warrant submission of the case to a jury on the theory of premeditation. The trial court denied the motion. Pearce now claims that the trial court erred in not granting his motion for judgment of acquittal.
Under Florida law, the unlawful killing of a human being is murder in the first-degree (1) "[w]hen perpetrated from a premeditated design to effect the death of the person killed or any human being"; or (2) "[w]hen committed by a person engaged in the perpetration of, or in the attempt to perpetrate, any ... kidnapping." § 782.04(1), Fla. Stat. (1999). A trial court should not grant a motion for judgment of acquittal unless there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law. Taylor v. State, 583 So.2d 323, 328 (Fla.1991). In moving for judgment of acquittal, Pearce *572 admitted the facts in evidence as well as every conclusion favorable to the State that the jury might fairly and reasonably infer from the evidence. Id. Where there is room for a difference of opinion between reasonable people as to the proof or facts from which an ultimate fact is to be established, or where there is room for such differences on the inferences to be drawn from conceded facts, the trial court should submit the case to the jury. Id. Once competent, substantial evidence has been submitted on each element of the crime, it is for the jury to evaluate the evidence and the credibility of the witnesses. Davis v. State, 703 So.2d 1055, 1060 (Fla.1997); see also Hufham v. State, 400 So.2d 133, 135-36 (Fla. 5th DCA 1981).
Premeditation is a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act about to be committed and the probable result of that act. Green v. State, 715 So.2d 940, 943 (Fla.1998); Asay v. State, 580 So.2d 610, 612 (Fla.1991). Whether a premeditated design to kill was formed prior to a killing is a question of fact for the jury that may be established by circumstantial evidence. Asay, 580 So.2d at 612. Circumstantial evidence of premeditation can include the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted. Spencer v. State, 645 So.2d 377, 381 (Fla.1994); Holton v. State, 573 So.2d 284, 289 (Fla.1990). However, where the element of premeditation is sought to be established by circumstantial evidence, the evidence relied upon by the State must be inconsistent with every other reasonable inference. Cochran v. State, 547 So.2d 928, 930 (Fla.1989). Notably, the circumstantial evidence rule does not require the jury to believe the defendant's version of the facts when the State has produced conflicting evidence. Spencer, 645 So.2d at 381. Where there is substantial, competent evidence to support the jury verdict, the verdict will not be reversed on appeal. Id.
A review of the record in this case reveals that there was sufficient evidence from which the jury could have inferred premeditation by Pearce. Pearce told the victims and their companions that his "money was their life," and that he expected them to come back with either his money or the drugs. Pearce subsequently told the victims and their companions that they would have to "pay the consequences" for losing his money. Pearce called armed assistance to the business location where he was holding the victims at gunpoint. Pearce rejected attempts and requests to let the victims leave. Pearce was the individual who ordered the victims into his car and drove the car to the remote location where the shootings took place. Pearce also switched guns with the triggerman, Smith, ostensibly to ensure that Smith had a functioning weapon. Pearce told Smith either to "pop" Tuttle in the jaw or "break" his jaw for stealing Pearce's money. After Smith shot Tuttle, Pearce requested assurance that Tuttle was dead. Smith assured Pearce that Tuttle was dead as he had "shot him in the head with a fucking .40 caliber" gun. When Pearce stopped the car and ordered Crawford out of the car, he thought that Tuttle was dead. Thus, even assuming arguendo that Pearce did not intend for Smith to shoot Tuttle, there is little doubt that Pearce intended for Smith to shoot Crawford, whose death is the basis of Pearce's first-degree murder conviction. There was no evidence that Pearce urged Smith not to shoot Crawford after Tuttle was shot or that Pearce in any way withdrew from this *573 criminal plan. Pearce drove the car approximately 200 yards away from the scene where Tuttle was shot in the head and left for dead, stopped the car, and ordered Crawford to get out of the car. Crawford pled for his life before being shot in the head by Smith. There is no evidence that the victims provoked these shootings in any way during the drive.
In light of this circumstantial evidence of premeditation, we find no error in the trial court's denial of Pearce's motion for judgment of acquittal as to premeditation.

Denial of Judgment of Acquittal on Felony Murder
Pearce also moved for a judgment of acquittal on the theory of felony murder, arguing that the State failed to establish that he was an aider or abetter of an underlying kidnapping and presented no proof of his intent to participate in a kidnapping that would support a theory of first-degree felony murder. The trial court denied the motion and submitted the case to the jury. Pearce now argues that the trial court erred in denying his motion.
As discussed above, there are two ways in which first-degree murder can be proven under Florida law: through a premeditated design to kill or when the killing occurs during the course of an enumerated felony, including kidnapping. See § 782.04(1), Fla. Stat. (1999). In order to prove kidnapping in Pearce's case, the State had to prove three elements: (1) Pearce forcibly or by threat confined and abducted Crawford and Tuttle against their will; (2) Pearce had no lawful authority to do so; and (3) Pearce acted with the intent to inflict bodily harm upon or terrorize the victims or another person. See § 787.01(1)(a), Fla. Stat. (1999).
Both Havner and Tuttle testified that Pearce ordered them into the business office, waved a gun around, and pointed the gun at them. Tuttle testified that Pearce threatened to shoot him in the head if he did not perform oral sex on him. Tuttle also testified that he repeatedly asked Pearce if he could leave and Pearce told him no. Havner and the others present testified that Pearce slammed her head against the air conditioner and threatened to shoot her in the head. Testimony also showed that Pearce refused to let the boys go when asked by Havner and Loucks at separate times. Even though Pearce may have left the victims alone in the office several times, there was little opportunity for them to escape from the business premises, which were surrounded by a high fence topped with barbed wire and behind a locked gate. According to Havner's brother, Havner was hysterical even after Pearce permitted her to leave and that she spent the rest of the night placing phone calls trying to verify the safety of Tuttle and Crawford. Havner testified that she was afraid of Pearce, that Pearce was irate, and that she and her companions were not free to leave the business location where Pearce confined them.
Pearce called his associate Butterfield, told him that he needed some help because he had been ripped off, and asked Butterfield to come armed. Butterfield arrived with Brittingham and Smith, who were also visibly armed. According to Butterfield, Pearce was "calling the shots" and was "in charge." Tuttle and Crawford were ordered into the car by Pearce, who had a gun in his hand. Brittingham testified that he interpreted Pearce's actions as threatening to the boys. Tuttle testified that he did not feel that he or Crawford was free to leave. Pearce stated his intent was to "rough up" the boys and teach them a lesson for losing his money. Pearce drove the car to a deserted area, ordered Tuttle out of the car, and instructed Smith to "break his jaw" or "pop him in the jaw." Pearce then drove a short distance *574 more and ordered Crawford out of the car. Because the victim's liberty was never restored prior to his death, there was a continuing kidnapping here. See Stephens v. State, 787 So.2d 747, 754 (Fla. 2001) (citing with approval State v. Stouffer, 352 Md. 97, 721 A.2d 207, 215 (1998)).
Pearce also argues that, in order to obtain his conviction for the acts of Smith under the felony murder rule, the State must establish beyond a reasonable doubt that Smith killed Crawford in furtherance of the kidnapping or a common criminal design, and not as an independent act of his own. However, because the State presented competent, substantial evidence that Pearce orchestrated the kidnapping and violence against the victims, it was a jury question whether the murder was an independent act of Smith.
The "independent act" doctrine that Pearce asserts "arises when one cofelon, who previously participated in a common plan, does not participate in acts committed by his cofelon, `which fall outside of, and are foreign to, the common design of the original collaboration.'" Ray v. State, 755 So.2d 604, 609 (Fla.2000) (quoting Dell v. State, 661 So.2d 1305, 1306 (Fla. 3d DCA 1995)). Under these limited circumstances, a defendant whose cofelon exceeds the scope of the original plan is exonerated from any punishment imposed as a result of the independent act. Id. "Where, however, the defendant was a willing participant in the underlying felony and the murder resulted from forces which they set in motion, no independent act instruction is appropriate." Id. (emphasis added); see also Lovette v. State, 636 So.2d 1304 (Fla. 1994).
Here, Pearce set the kidnapping in motion, brought Smith into contact with the victims, gave Smith a functioning weapon that was used as the murder weapon, and drove the victims to a remote location where the shootings occurred. "Only a finding that the criminal episode had ceased might give significance to" Pearce's argument. Ray, 755 So.2d at 609. The facts do not support such a conclusion here. Thus, there was sufficient evidence to deny Pearce's motion for judgment of acquittal on felony murder.
Although Pearce raises no other issues relating to his convictions, we have reviewed the evidence and find sufficient evidence to support his convictions. See Fla. R.App. P. 9.142(a)(6) ("In death penalty cases, the court shall review the evidence to determine if the interest of justice requires a new trial, whether or not insufficiency of the evidence is an issue presented for review."). Accordingly, we affirm Pearce's convictions for first-degree murder with a firearm and attempted first-degree murder with a firearm.

During the Course of a Kidnapping Aggravating Circumstance
The trial court found that Crawford's murder was committed while Pearce was engaged in or an accomplice in the commission of the crime of kidnapping. Pearce argues that the trial court erred in finding this aggravating circumstance as it was not proven beyond a reasonable doubt.
Section 921.141(5)(d), Florida Statutes (1999), provides that it is an aggravating circumstance if "[t]he capital felony was committed while the defendant was engaged in, or was an accomplice, in the commission of ... any ... kidnapping." On appeal, this Court does not reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt  that is the trial court's job. Rather, this Court reviews the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent, substantial *575 evidence supports its finding. Alston v. State, 723 So.2d 148, 160 (Fla.1998). To establish the "during the commission of a kidnapping" aggravating circumstance, the State must prove beyond a reasonable doubt each of the elements of kidnapping. Anderson v. State, 841 So.2d 390, 404 (Fla.), cert. denied, ___ U.S. ___, 124 S.Ct. 408, 157 L.Ed.2d 292 (2003).
As discussed above, the evidence supports the trial court's finding of this aggravating circumstance. Tuttle, Havner, and other witnesses testified that Pearce held the victims against their will with a threat of violence and that he also ordered them to get in his car against their will. Pearce had no lawful authority to do so. Even assuming that Pearce did not originally intend to kill the victims, he clearly intended to inflict bodily harm upon them as evidenced by his statement to Loucks that he meant to "rough up" the victims and teach them a lesson. See § 787.01(1)(a)(3), Fla. Stat. (1999).
Pearce also argues that his death sentence is not appropriate under the Supreme Court's rulings in Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). In Enmund, the United States Supreme Court held that the Eighth Amendment of the United States Constitution does not permit imposition of the death penalty on a defendant "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." 458 U.S. at 797, 102 S.Ct. 3368. In Tison, the Supreme Court expanded the Enmund culpability requirement for imposing a death sentence under a felony murder theory to include "major participation in the felony committed, combined with reckless indifference to human life." 481 U.S. at 158, 107 S.Ct. 1676; see also Franqui v. State, 804 So.2d 1185, 1206 n. 12 (Fla. 2001).
While the trial court did not engage in a specific Enmund/Tison analysis in its sentencing order, the court did analyze the role of Pearce and his culpability in this crime. Diaz v. State, 513 So.2d 1045, 1048 n. 2 (Fla.1987) (requiring trial courts to include in their sentencing orders findings supporting the Enmund/Tison culpability requirement). As explained in detail in the sentencing order and as supported by the evidence in this case, Pearce's role in the murder satisfies the Enmund/Tison requirements. Pearce was a major participant in the underlying felony of kidnapping and "orchestrated the events leading to [the victim's] death." Lebron v. State, 799 So.2d 997, 1020 (Fla.2001). Additionally, where there is substantial, competent evidence to uphold a conviction under a premeditation theory, Enmund/Tison is not applicable. See Teffeteller v. Dugger, 734 So.2d 1009, 1018 (Fla.1999). As explained above, the record in this case reveals sufficient circumstantial evidence from which the jury could have inferred premeditation by Pearce.
Thus, we conclude that the trial court properly applied the aggravating circumstance of commission during the course of a kidnapping in this case.

CCP Aggravating Circumstance
The trial court concluded that Crawford's murder was "committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification." § 921.141(5)(i), Fla. Stat. (1999). Pearce contends that the State failed to show the necessary elements of CCP. He further argues that, even if the underlying felony of kidnapping was fully planned ahead, it would not constitute *576 CCP if the kidnapping plan did not also include the commission of murder.
As discussed above, this Court reviews the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent, substantial evidence supports its finding. Alston v. State, 723 So.2d 148, 160 (Fla.1998). To establish the CCP aggravator, the State must prove beyond a reasonable doubt that (1) "the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic or a fit of rage (cold)"; (2) "the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated)"; and (3) "the defendant exhibited heightened premeditation (premeditated)". Jackson v. State, 648 So.2d 85, 89 (Fla. 1994).
This Court has held that execution-style killing is by its very nature a "cold" crime. See Lynch v. State, 841 So.2d 362, 372 (Fla.), cert. denied, ___ U.S. ___, 124 S.Ct. 189, 157 L.Ed.2d 123 (2003); Walls v. State, 641 So.2d 381, 388 (Fla.1994). As to the "calculated" element of CCP, this Court has held that where a defendant arms himself in advance, kills execution-style, and has time to coldly and calmly decide to kill, the element of calculated is supported. See Hertz v. State, 803 So.2d 629, 650 (Fla.2001); Knight v. State, 746 So.2d 423, 436 (Fla.1998) (holding "[e]ven if Knight did not make the final decision to execute the two victims until sometime during his lengthy journey to his final destination, that journey provided an abundance of time for Knight to coldly and calmly decide to kill"). This Court has "previously found the heightened premeditation required to sustain this aggravator where a defendant has the opportunity to leave the crime scene and not commit the murder but, instead, commits the murder." Alston v. State, 723 So.2d at 162; see also Lynch, 841 So.2d at 372 (noting that defendant had five-to seven-minute opportunity to withdraw from the scene or seek help for victim, but instead calculated to shoot her again, execution-style).
The sentencing order in this case discusses in great detail the facts that support this aggravating circumstance: Pearce confined the victims, called for assistance from his friends, and requested they come to the location armed, thereby revealing a plan that required the use of firearms. The circumstances also showed that the "business" for which Pearce summoned the armed assistance "was intended to harm Crawford and Tuttle in some fashion." Pearce and Smith engaged in a private conversation when Smith arrived at the location. While the content of this conversation is not known, the conversation shows they had an opportunity to discuss a plan. Pearce drove the car and stopped on his own initiative along the deserted rural road where the shootings occurred. Pearce exchanged firearms with Smith when informed that Smith's gun was jammed. Even though Pearce did not actually pull the trigger, he voiced neither objection nor surprise when Smith shot Tuttle in the head. Instead, Pearce requested assurance that Tuttle was dead. Pearce drove the vehicle a short distance down the road and again stopped on his own initiative. He asked no questions after Smith shot Crawford twice. Pearce and Smith then drove to a restaurant where they ate breakfast and then threw the murder weapon into Tampa Bay. There was no evidence that Pearce acted in an emotional frenzy, panic or rage. There was no evidence of victim resistance or struggle that could have provoked the shootings. Further, Pearce had the means and opportunity to either "rough up" or shoot the victims at the business location. *577 Instead, he called his associates, took the victims for a ride at night to a remote, unlighted location, and sat by while Smith shot them in the head execution style. There is competent, substantial evidence in the record to support these findings. Thus, we conclude that the CCP aggravating circumstance was properly found in this case.

Proportionality
Although Pearce does not raise an issue relating to the proportionality of his death sentence, this Court performs proportionality review to prevent the imposition of "unusual" punishments contrary to article I, section 17 of the Florida Constitution. See Sexton v. State, 775 So.2d 923, 935 (Fla.2000). In deciding whether the death sentence is proportional in a particular case, this Court is required to consider the totality of circumstances surrounding the case and compare it to other capital cases. Id.; Brown v. State, 721 So.2d 274 (Fla.1998). Our proportionality review "is not a comparison between the number of aggravating and mitigating circumstances." Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990).
Comparing this case to other capital cases with similar aggravating and mitigating circumstances demonstrates that Pearce's sentence of death is proportional. The trial court found three aggravating circumstances (CCP, prior violent felony, and committed during a kidnapping) and little mitigating circumstances. As this Court stated in Larkins v. State, 739 So.2d 90, 95 (Fla.1999), the CCP aggravator is one of the "most serious aggravators set out in the statutory sentencing scheme." In other similar "execution-style" killings, this Court has affirmed sentences of death. See Ford v. State, 802 So.2d 1121, 1133 (Fla.2001) (finding death sentence proportional with four aggravating circumstances of heinous, atrocious, or cruel, CCP, commission during the course of a felony, and contemporaneous murder of another victim and some mitigation), cert. denied, 535 U.S. 1103, 122 S.Ct. 2308, 152 L.Ed.2d 1063 (2002); Foster v. State, 778 So.2d 906, 921 (Fla.2000) (finding death sentence proportional with two aggravating circumstances of avoiding arrest and CCP and little mitigation); Jennings v. State, 718 So.2d 144 (Fla.1998) (upholding death sentence with three aggravating factors of commission during the course of a robbery, avoiding arrest, and CCP and several mitigating factors); Jones v. State, 690 So.2d 568, 571 (Fla.1996) (finding death sentence proportional with three aggravating circumstances of CCP, contemporaneous attempted murder of second victim, and pecuniary gain and two mitigating circumstances). Pearce's death sentence is also proportionate to other cases where the persons who were the "masterminds" or dominating force behind the murder have been sentenced to death, even though they did not actually commit the murder. See, e.g., Larzelere v. State, 676 So.2d 394, 407 (Fla.1996); Fotopoulos v. State, 608 So.2d 784, 792-94 (Fla.1992). Thus, we find the death sentence proportionately warranted in this case.

CONCLUSION
Based on the reasons discussed above, we affirm Pearce's convictions and his sentence of death.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Pearce and his codefendant Lawrence Joseph Smith were tried separately for these crimes. Smith was convicted of first-degree murder and attempted first-degree murder and sentenced to death. Smith's convictions and life sentence for attempted first-degree murder were affirmed on direct appeal. See Smith v. State, 866 So.2d 51 (Fla.2004). However, based on erroneous statements in the sentencing order, this Court remanded the case for resentencing before the trial judge for the first-degree murder conviction. Id. at 67-68.
[2] Spencer v. State, 615 So.2d 688 (Fla.1993).