961 So.2d 1104 (2007)
Jimmy Douglas JACKSON, Appellant,
v.
STATE of Florida, Appellee.
No. 5D06-517.
District Court of Appeal of Florida, Fifth District.
August 3, 2007.
*1105 James S. Purdy, Public Defender, and Ailene S. Rogers, Assistant Public Defender, Daytona Beach, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Wesley Heidt, Assistant Attorney General, Daytona Beach, for Appellee.
THOMPSON, J.
Jimmy Douglas Jackson was convicted of aggravated battery with a deadly weapon or causing bodily harm[1] for stabbing Bryan Simmons with a knife on 10 July 2005. After a January 2006 trial, the jury found Jackson guilty as charged, and he was sentenced to seven years' incarceration. Jackson appeals the admission of an eyewitness's statement to the police, which differed from the witness's account at trial. We reverse.
The victim, Bryan Simmons, testified. He had been convicted of three felonies and three crimes involving dishonesty or false statements, and was unemployed and living in a Volusia County motel on 10 July 2005. That night, he went to a homeless camp located in woods near International Speedway Boulevard. There were five or six people there, including his friend Steven Claflin. Jackson, whom Simmons had known for a few years and with whom he fought in 2003, was also there. Simmons drank about four beers while the other campgoers drank Listerine and cooked stew. A fight suddenly broke out between Claflin and Jackson, but Simmons broke it up. Everyone settled down and resumed talking for awhile, but Jackson, without provocation, "just jump[ed] up and . . . hit[] [Simmons]" with a six- or seven-inch butcher knife.[2] Simmons ran and was hospitalized *1106 for two days.[3]
Claflin, who knew Jackson and Simmons before the stabbing occurred, presented a different story. He lived at the campsite in the woods at the time. He drank at least a case of beer[4] that day and started drinking at nine that morning. After their fistfight that night, Jackson and Claflin sat down, had a beer, and laughed it off. Claflin did not recall if Simmons was there during their fight, but Simmons was there afterward. Simmons and Jackson started to argue; Claflin was not surprised, because they had fought with each other the whole time Claflin had known them. Claflin did not see the stabbing:
A. I washad turned around to tend the fire, and I heard a little scuffle going on behind me; I didn't pay any attention. I turned around and looked and Mr. Simmons was running out of camp, and Jimmy was standing with a knife in his hand.
Q. . . . And did you actually see him get up and stab him . . . ?
A. No, I did not.
That night, Claflin and Jackson were arrested. Claflin told the police what Jackson had said after Simmons ran Jackson had really f* * * *d up and should not have done it. At trial, Claflin could not describe much about the police's arrival; he "was kind of getting into a blackout situation, abundant alcohol." He did not recall talking to the police at that point, did not see what Jackson did with the knife, did not recall telling anyone that Jackson had thrown it away, and did not know who was at the campsite that night. At trial, he said the "kitchen-type" knife was eight or ten inches long, but he did not know what the handle looked like. He recalled giving a statement to Inspector Ron Morgan in August 2005 in which he said the knife had a wooden handle with a serrated edge; the knife introduced in evidence looked vaguely familiar, seemed similar to the one that Jackson had that night, and could have been one of many in camp.
Over objection, Investigator Morgan testified that he had recorded Claflin's statement to the police, in which Claflin said he saw Jackson stab Simmons. The court overruled a timely hearsay objection because it held that the statement, as a "prior inconsistent statement," was admissible under an exception to the hearsay rule. In Claflin's statement, Claflin said that, while everyone was drinking, Claflin looked up to see a quick motion and saw Jackson go over and stab Simmons.
The State addressed Claflin's August 2005 statement twice in closing argument:
[T]he victim himself says that it was the Defendant who did it. We have Steve Claflin who also sayssays here today, that "Well, I really didn't see it; my back was turned, but I heard a commotion, turned around and the Defendant was the one standing there with a knife in his hand." That's not quite what he told Investigator Morgan, but I hope that sometimes you can look at what happens in a courtroom and not only you have to look at the overall picture. And I hope you noticed when Mr. Claflin walked in and walked out of this room, who was he looking at? What was his focus? If you did, you'd understand why his testimony was a little bit different than it was back last August, and last August what he said when the investigator *1107 went to the camp, talked with him and recorded what he said. And he very clearly said, "I saw[]There was a verbal argument going on between Mr. Simmons and the Defendant, and then the Defendant jumped up and stabbed the[]stabbed the victim," which is exactly what the victim says what happened.
Later, the State reiterated that Simmons's testimony and Claflin's testimony during trial "and what he said in August," taken with the evidence in case, showed it had proved that Jackson committed aggravated battery.
On appeal, the State does not dispute the statement was improperly admitted. Rather, it argues that the error was not preserved and any error in admitting the statement was harmless. We disagree. The error was preserved, and we cannot conclude that it was harmless.
Admitting Claflin's August 2005 statement was an abuse of discretion. It was not admissible as substantive evidence as a prior inconsistent statement because it was not "given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition." § 90.801(2)(a), Fla. Stat. (2005); Pearce v. State, 880 So.2d 561, 569 (Fla.2004). "[A] statement given under oath during a police investigation is not a statement given at an `other proceeding' and consequently is not admissible as substantive evidence under section 90.801(2)(a)." Pearce, 880 So.2d at 569 (citing State v. Delgado-Santos, 497 So.2d 1199 (Fla.1986)); Thomas v. State, 697 So.2d 926, 927 (Fla. 5th DCA 1997). Similarly, the State did not properly use the statement to impeach Claflin. Before questioning Claflin about the contents of a previous inconsistent statement, the State needed to call to his attention the time, place, and person to whom the statement was made. See Pearce, 880 So.2d at 569-70. Because the State never presented Claflin the opportunity to address the prior statement, the State was not permitted to introduce extrinsic evidence of the prior inconsistent statement. See id. at 570 (quoting § 90.614(2)). Even if the State had laid the proper foundation, the theory underlying the admissibility of a prior statement as impeachment "is not that the prior statement is true and the in-court testimony is false, but that[,] because the witness has not told the truth in one of the statements, the jury should disbelieve both statements." Id. at 569 (citing Charles W. Ehrhardt, Florida Evidence § 608.4 (2002 ed.)).
The State, as the beneficiary of the error, must demonstrate beyond a reasonable doubt that the error did not contribute to the verdict. State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). The statement admitted into evidence was classic hearsay. It was admitted not merely to impeach Claflin, but as substantive evidence; the State encouraged the jury to consider Claflin's August 2005 testimony as the real story. Because there was little physical evidence and no independent eyewitness testimony other than Claflin's to corroborate Simmons's account, their credibility was a crucial issue. Admitting Claflin's prior statement tended to bolster Simmons's credibility. See, e.g. Carter v. State, 951 So.2d 939, 944 (Fla. 4th DCA 2007). The prejudicial effect was compounded by its introduction through Investigator Morgan, a 32-year police veteran, whom the jury may have viewed as a disinterested, objective, and credible witness. Id.
In light of the uncertainty surrounding Simmons's versions of the story, the differences between Simmons's and Claflin's accounts, testimony about animosity between Simmons and Jackson, and Claflin's substantial consumption of alcohol on the day *1108 the stabbing occurred, there is a reasonable possibility that admitting Claflin's prior statement affected the jury's verdict.
Accordingly, we REVERSE and REMAND for a new trial.
MONACO, J., concurs.
GRIFFIN, J., dissents with opinion.
GRIFFIN, J., dissenting.
I respectfully dissent because I do not believe the trial court erred.
The testimony of the investigator concerning the statement made to him by Steven Claflin that was different from his trial testimony was admissible as extrinsic evidence of a prior inconsistent statement, so long as the proper predicate had been laid as required by section 90.614(2), Florida Statutes (2005). The only objection was "hearsay," to which the State replied that it was a "prior inconsistent statement." No objection was made to the lack of the required statutory predicate for admission of the prior inconsistent statement. See Andrews v. State, 263 So.2d 846 (Fla. 1st DCA 1972). Nor was there any objection to the State's apparent reference to the prior consistent statement as substantive evidence during closing argument.
NOTES
[1] § 784.045(1)(a)1., 2., Fla. Stat. (2005).
[2] The police could not find the knife initially, but after Simmons was released from the hospital, he located it at the camp and turned it over to the police.
[3] The State introduced into evidence Simmons's medical records, which suggested that his story about the stabbing varied somewhatit occurred in a bar, or while breaking up a fight, or while he was running away after breaking up a fight.
[4] Twenty-four twelve-ounce beers.